Filed 9/9/25  In re H.C. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re H.C., a Person Coming Under the Juvenile Court Law. | B341208<br>(Los Angeles County Super. Ct. No. 24CCJP02171B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DANIEL C.,<br><br>    Defendant and Appellant. | |

APPEAL from findings and orders of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Affirmed.

Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

_____

Defendant and appellant Daniel C. (father) appeals from the juvenile court's October 2, 2024, jurisdictional findings and dispositional orders in which his daughter, H.C. (minor, born Sept. 2012), was declared a dependent of the court and removed from his custody. Father argues that (1) insufficient evidence supports one of the jurisdictional findings; (2) insufficient evidence supports the removal order; and (3) the court abused its discretion by requiring him to submit to weekly drug tests and undergo a psychological assessment.

We affirm.

## BACKGROUND

### I. *The Family*

Father and Z.O. (mother) are minor's parents. Mother has another daughter, A.O. (born Apr. 2008), who has a different father than minor. Mother is not a party to this appeal, nor is A.O. a subject of it.

### II. *Referral*

On June 14, 2024, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging physical abuse of minor and A.O. by father. According to the

reporting party, father had stated that he wanted to kill his family. Father had also expressed suicidal ideation.

III. *Initial Investigation*

When interviewed by a DCFS social worker on June 19, 2024, father denied the allegations.

Father's work manager was interviewed on July 1, 2024. The manager reported that mother had called in an attempt to locate father. When father returned to work a few days later, he told the manager that he was "'not in a good mental state [and] d[idn't] know what to do.'" (Bolding omitted.) Father disclosed that he and mother had gone on a hike, they were having marital problems, and he had "dark thoughts" about killing mother. (Bolding omitted.) One of father's coworkers disclosed to the manager that father had reported being scared to go home and hurt his children. Father had no plan to harm himself or others.

On July 5, 2024, mother called the social worker and reported that father had threatened to kill her. Father broke mother's cell phone and "trashed the home in the presence of" minor and A.O. The police responded to the home and father fled.

Interviewed later that day, mother reported that father had become jealous early that morning, "got more aggressive with" mother, "pushed her on the bed[,]" and "verbally abus[ed] her." (Bolding omitted.) Father threatened, "'I will kill you if you cheat on me.'" Father got on top of mother and began to choke her "forcefully" with two hands, causing her to almost lose consciousness. (Bolding omitted.) A.O. intervened and pushed father off of mother. Father then pushed A.O. away from him. Father pushed mother against the wall and slapped the right side of her face, injuring her lower lip. Mother tried to call the police

with her cell phone but father took it and destroyed it, along with mother's glasses. Father also destroyed the television, a lamp, and slashed two of mother's car tires. Mother claimed that this was the first time father had ever been physical with her and that she had never seen him act in such a way.

An emergency protective order was issued against father. When told by a social worker that it would expire on July 12, 2024, mother asked if father could move back in then. Mother stated, "'I need him to pay the rent for July.'" (Bolding omitted.) Mother did not intend to seek an extension of the restraining order. She said, "'I am not going to press charges on him[.] I want him back with the family[.] [W]e are never separated.'" (Bolding omitted.)

According to A.O., on the morning of July 5, 2024, mother and father argued about mother communicating with another man. Father's anger escalated to the point where he pushed mother down on the bed and got on top of her. A.O. intervened when she saw father "choking" mother. (Bolding omitted.) A.O. pushed father off of mother, and father responded by pushing A.O. Father did not push A.O. "hard, but pushed [her] away." (Bolding omitted.)

Father was interviewed on July 8, 2024. He said he was "'devastated, sad, c[ould]n't sleep [and was] having nightmares.'" Father reported drinking alcohol rarely, although he had last drunk the week before. He last used cocaine two to three years earlier. He said that he and mother rarely fought and "'this is a first time thing.'"

Father was arrested on July 10, 2024.

According to a Los Angeles Police Department investigative report, at approximately 4:55 a.m. on July 5, 2024, officers

4

responded to a call of a suspected assault with a deadly weapon. The officers met with mother outside a convenience store. She was "crying uncontrollably, fearful, [and had] fresh bruising and dried blood on her arms." She reported that she and father had argued and that it had escalated to a physical fight. Father had threatened to kill her. Father had shoved mother onto the bed; A.O. attempted to calm father down by intervening, resulting in father shoving A.O. away. Mother stood up from the bed to defend A.O., and father shoved mother back on the bed a second time. Father then climbed onto the bed, sat over mother, and strangled her with both of his hands around her neck. Mother felt "immense pressure on her neck to the point where she could no longer breathe and started to lose consciousness." A.O. pushed father off of mother. The report documented that mother sustained two six-inch bruises, one on each upper arm. She also had red marks on both sides of her neck. Both of her eyelids were swollen.

IV. *Detention*

On July 10, 2024, DCFS obtained an order authorizing the detention of minor and A.O. from parental custody. Minor and A.O. were placed in the family home under the care of the paternal grandmother, A.C. (paternal grandmother). Mother and father moved out of the home.

V. *Dependency Petition*

On July 12, 2024, DCFS filed a dependency petition seeking the juvenile court's exercise of jurisdiction over minor and A.O. pursuant to Welfare and Institutions Code section 300, subdivisions (a) (serious physical harm) and (b)(1) (failure to

5

protect).[1]  Counts a-1 and b-1 alleged that mother and father had a history of engaging in violent altercations.  Count b-2 alleged that father had a history of mental and emotional problems, including suicidal and homicidal ideation.  Count b-3 alleged that father had a history of substance abuse.

## VI. *Detention Hearing*

At the July 15, 2024, detention hearing, the juvenile court found that a prima facie showing had been made that minor was a person described by section 300.  The court detained minor from father and released her to mother under DCFS supervision.  Father was granted monitored visitation with minor, provided neither mother nor paternal grandmother served as the monitor.  Upon mother's request, the court also issued a temporary restraining order protecting mother from father.[2]

## VII. *Jurisdiction/Disposition Report*

Minor was interviewed by a dependency investigator on August 13, 2024.  Minor stated that she had seen father choking mother on July 5, 2024, and it had looked like mother could not breathe.  Minor denied many of the other allegations and reported that she had never been scared of him and that he had never threatened anyone.

Mother denied that she had an argument with father on July 4, 2024, and denied that father had grabbed a knife and threatened to kill her and himself.  Mother denied that father had put pressure on her neck during the July 5, 2024, incident.

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]    A criminal protective order protecting mother and A.O. from father had already been issued on July 12, 2024.

Mother denied that father had mental health problems or had attempted to harm himself.

Paternal grandmother was residing with mother and helping her care for the children. According to paternal grandmother, father was living in his car. When she spoke to him over the phone, "he seem[ed] remorseful of the incident."

VIII. *Adjudication Hearing*

After entertaining oral argument at the adjudication hearing on October 2, 2024, the juvenile court sustained counts a-1, b-1,[3] and b-2.[4] The court dismissed count b-3 regarding

---

[3] According to counts a-1 and b-1, mother and father "have a history of engaging in violent altercations." On July 4, 2024, father brandished a knife, threatened to use it to kill mother and himself, and rubbed it against his body causing cuts and bleeding. On July 5, 2024, father struck and threw items in the home and broke mother's glasses. Father pushed mother onto the bed and threatened to kill her. Father got on top of mother and used both hands "to forcefully choke" her. Mother was unable to breathe and almost lost consciousness. When A.O. intervened by pushing father off mother, father pushed A.O. Father pushed mother against the wall and struck her face, injuring mother's lower lip. Mother attempted to contact law enforcement, but father took mother's phone away and broke it. Father brandished a knife and slashed the tires of mother's vehicle. Mother sustained two six-inch bruises, red marks on her neck, and swollen eyelids. On July 10, 2024, father was arrested for inflicting corporal injury on a spouse/cohabitant, attempted murder, battery, and vandalism. Father's "violent conduct . . . against . . mother . . . endangers the children's physical health and safety, creates a detrimental home environment and places the children at risk of serious physical harm, damage, [and] danger."

7

father's substance abuse. The court explained that it found "the statements by the children and the statements by the mother where they walk back some of their initial allegations" lacked credibility.

The juvenile court declared minor a dependent of the court under section 300, subdivisions (a) and (b)(1), and removed her from father's custody. The court placed minor in mother's home under DCFS supervision. The court explained, "The father is in denial and to some degree the mother is in denial as well. [¶] So it's not safe to have both of these parents together."

The court ordered father to enroll in a 52-week domestic violence program, parenting education, and individual counseling to address case issues, and to submit to random and on-demand weekly drug testing and a psychological assessment. The court maintained father's monitored visitation in a neutral setting.

IX. *Appeal*

Father timely appealed from the jurisdictional findings and dispositional orders.

---

4      According to count b-2, father "has mental and emotional problems including homicidal ideation, suicidal ideation and aggressive behavior," rendering him "unable to provide regular care and supervision of" minor. On July 4 and 5, 2024, father threatened to kill mother and himself with a knife. Father had previously threatened to kill mother, the children, and himself. Father had "failed to obtain mental health treatment for . . . [his] mental and emotional problems." Mother had failed to protect the children, allowing him to reside in the family home and have unlimited access to them. Father's mental and emotional problems "endanger[] the children's physical health and safety . . . and place[] the children at risk of serious physical harm, damage, and danger."

## DISCUSSION

### I. *Father's Jurisdictional Challenge is Moot*

"[T]he principle that '[d]ependency jurisdiction attaches to a child, not to his or her parent' [citation], means that "'[a]s long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate"' [citation]. Thus, where jurisdictional findings have been made as to both parents but only one parent brings a challenge, the appeal may be rendered moot. [Citation.] The same is true where there are multiple findings against one parent; the validity of one finding may render moot the parent's attempt to challenge the others. [Citations.]" (*In re D.P.* (2023) 14 Cal.5th 266, 283–284.) "However, where a jurisdictional finding 'serves as the basis for dispositional orders that are also challenged on appeal' [citation], the appeal is not moot." (*Id.* at p. 283.)

On appeal, father only challenges count b-2, which alleges that father's mental and emotional problems placed minor at risk of serious physical harm. Because the unchallenged a-1 and b-1 counts pertaining to father's violent altercations with mother bring minor within the juvenile court's jurisdiction under section 300, subdivisions (a) and (b)(1), father's arguments regarding the b-2 count are moot and we decline to exercise our discretion to review them. (See *In re D.P., supra,* 14 Cal.5th at pp. 283–284.)

Father urges us to find his jurisdictional challenge justiciable, arguing that count b-2 "logically formed the primary basis" for the portion of father's case plan requiring him to undergo a psychological assessment. We are unpersuaded. The juvenile court did not expressly tie the psychological assessment order to count b-2 and was "not limited to the content of the sustained petition when it consider[ed] what dispositional orders

9

would be in the best interests of the child[]. [Citations.]" (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311 (*Briana V.*).) As discussed more fully below, the record as a whole, as well as the sustained counts a-1 and b-1, provides ample support for the order, even without reliance on the substance of count b-2. Accordingly, were we to find error regarding the sustaining of count b-2, we could provide no effective relief that would have any practical or tangible impact on father's conduct or legal status. (See *In re D.P.*, *supra*, 14 Cal.5th at p. 277 ["relief is effective when it 'can have a practical, tangible impact on the parties' conduct or legal status[]'"]; *In re I.A.* (2011) 201 Cal.App.4th 1484, 1490 ["An important requirement for justiciability is the availability of 'effective' relief"].)

II. *Substantial Evidence Supports the Removal Order*

    A. <u>Applicable law</u>

        Before removing a minor from a parent's custody, the juvenile court is required to make one of five specified findings by clear and convincing evidence. (§ 361, subd. (c).) One ground for removal is that there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if the child were returned home, and there are no reasonable means to protect the child absent removal. (§ 361, subd. (c)(1).) "'"Clear and convincing" evidence requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind. [Citations.]' [Citation.] Actual harm to a child is not necessary before a child can be removed. 'Reasonable apprehension stands as an accepted basis for the exercise of state power.' [Citation.]" (*In re V.L.* (2020) 54 Cal.App.5th 147, 154.)

B. Standard of review

We review a dispositional order removing a minor from parental custody for substantial evidence. (*In re V.L.*, *supra*, 54 Cal.App.5th at p.154.) Because the juvenile court must make its finding that a ground for removal exists under the clear and convincing evidence standard of proof (§ 361, subd. (c)), "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true" (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011).

C. Analysis

Substantial evidence supports the juvenile court's order removing minor from father. Father violently attacked mother and destroyed property in minor's presence. Father forcefully choked mother to the point that she had difficulty breathing and almost lost consciousness. Father threatened to kill mother and himself. When minor's older half-sister, A.O., intervened to protect mother, father pushed A.O. The court could readily conclude that father's homicidal intent, expressed both physically and verbally, subjected minor to substantial danger absent removal from his custody.

Father resists this conclusion, arguing that the risk to minor only existed when mother and father were together and, therefore, minor could have safely "separately remain[ed]" in father's custody subject to DCFS supervision. He further contends that allowing minor to remain in mother's care, but not father's, is "internally contradictory." We disagree. Unlike father, mother did not launch a violent and potentially fatal attack in minor's presence nor did she threaten to commit murder. Father's violence, homicidal ideation, and lack of

11

protective capacity provide strong support for the juvenile court's removal order from father only.

Father's reliance on *In re I.R.* (2021) 61 Cal.App.5th 510 is unavailing. In that case, the Court of Appeal reversed a removal order where "[t]he sole source of potential danger to [the child] while in [the f]ather's care . . . derive[d] from his history of domestic violence with [the m]other," which consisted of two instances of slapping the mother and, on one occasion, throwing a baby shoe at her. (*Id.* at p. 521.) The nature of father's violence towards mother in the instant case—in which he choked her to the point of near unconsciousness and expressed an intent to kill her—is markedly different and more serious. And, unlike in *In re I.R.*, the record here contains substantial evidence that the domestic violence between father and mother was likely to continue, as both parents had minimized the abuse and mother had expressed a desire to reconcile with father and reunite the family.

III. *Father's Case Plan Was Not an Abuse of Discretion*

Father contends that two aspects of his court-ordered case plan—requiring him to submit to a psychological assessment and weekly drug and alcohol testing—constituted an abuse of the juvenile court's discretion.

Once dependency jurisdiction is exercised, a juvenile "court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child[.]" (§ 362, subd. (a).) The juvenile court has broad discretion to determine what dispositional plan will serve the best interests of the child. (*Briana V.*, *supra*, 236 Cal.App.4th at p. 311.) The "court may direct any reasonable orders to the parents or guardians of the child[,]" including "a direction to

12

participate in a counseling or education program," provided the program is "designed to eliminate those conditions that led to the court's finding that the child is a person described by [s]ection 300." (§ 362, subd. (d).) We review the court's decision regarding which orders to impose for an abuse of discretion. (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 186–187.)

Assuming that father properly preserved his objections for appellate review, we find nothing arbitrary, capricious, or patently absurd about the juvenile court's case plan. (See *In re Caden C.* (2021) 11 Cal.5th 614, 641 ["A court abuses its discretion only when ""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination[]""""].)

Father admitted to drinking alcohol around the time of his violent attack on mother and to prior cocaine use. The court could reasonably suspect that alcohol abuse or illicit drug use might have contributed to father's conduct and that it served minor's best interest to closely monitor father's consumption through weekly drug and alcohol testing. Random drug and alcohol tests would also "provide an added incentive for [father] to avoid illicit drugs and excessive alcohol consumption, either of which w[ould] interfere with his ability to provide a suitable home for [minor] and achieve reunification." (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008.)

As for the psychological assessment, the record contains evidence that father harbored homicidal and suicidal ideations.[5] When interviewed on July 8, 2024, father reported being

---

[5] We make this determination independent from the fact that the juvenile court sustained count b-2 related to father's mental health problems and failure to obtain treatment.

13

"'devastated'" and "'sad'" and having sleep difficulties and nightmares. A psychological assessment could help father identify and address possible mental health issues and assist him in protecting minor upon reunification. (See *Laurie S. v. Superior Court* (1994) 26 Cal.App.4th 195, 202 [a "psychological evaluation is an 'information-gathering tool[]'"].)

We therefore conclude that the juvenile court acted well within its broad discretion in ordering father to submit to drug/alcohol testing and a psychological assessment.

## DISPOSITION

The jurisdictional findings and dispositional orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST


We concur:


_____, P. J.
LUI


_____, J.
RICHARDSON

14